# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALBERTINA FRANCHINI,

    Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

    Defendant.

No. 15 C 2339

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Albertina Franchini filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et. seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that

"any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 24, 2011, alleging that she became disabled on December 1, 2008, due to cervical and lumbar degenerative disease, depression, gastro-esophageal reflux disorder (GERD), and fibromyalgia. (R. at 11, 293, 313). The application was denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 11, 174–75, 188). On June 6, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 11, 31, 36–87, 111–13, 127–30). The ALJ also heard testimony from Plaintiff's friend Joanne Zanni, Mark I. Oberlander, Ph.D., a medical expert (ME), Ronald A. Semerdjian, M.D., also an ME, and Margaret H. Ford, a vocational expert (VE). (*Id.* at 11, 88–173, 266–77).

The ALJ denied Plaintiff's request for benefits on November 29, 2013. (*Id.* at 11–25). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since December 1, 2008, her alleged onset date. (*Id.* at 13). At step two, the ALJ found that Plaintiff has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, degenerative disease of the left shoulder, asthma by history, fibromyalgia by history, GERD by history, history of migraine headaches, depressive disorder secondary to a general medical condition/chronic pain syndrome, major depressive disorder, and a history of alcohol abuse and dependence. (*Id.*). At step three, the ALJ found that Plaintiff's impairments, alone or in combination, do not

meet or medically equal the severity of any of the listings enumerated in the regula-

tions. (*Id.* at 13–14).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[2] and de-

termined that Plaintiff has the RFC to:

> lift and/or carry up to 20 pounds occasionally, and up to 10 pounds fre-
> quently; push/pull a weight equivalence up to 20 pounds occasionally,
> and 10 pounds frequently; sit, stand and walk respectively, with nor-
> mal breaks for up to six hours each in an eight-hour workday; may not
> climb ladders, ropes, or scaffolds; but may otherwise climb
> ramps/stairs, balance, stoop, kneel, crouch, and crawl no more than oc-
> casionally; may not with the non-dominant left upper extremity per-
> form overhead work more than occasionally; must avoid concentrated
> exposure to fumes/odors/dusts/gases/and other pulmonary irritants;
> does not possess the capacity to understand, recall, focus upon, attend
> to, or carry out complex or detailed instructions or to perform complex
> or detailed tasks, but retains the capacity [to] understand, recall focus
> upon, attend to and carry out simple routine instructions, and to focus
> upon and perform simple routine tasks (those that do not change on a
> daily basis), at a sustained workmanlike pace; may not perform work
> which requires more than incidental contact with members of the gen-
> eral public; may not perform work which requires that she work in di-
> rect concert or cooperation with coworkers as to the performance of
> joint tasks or mutual projects; but retains the capacity to perform indi-
> vidually assigned tasks in the presence or proximity to coworkers; and
> may not perform work which requires more than occasional direct deal-
> ings with supervisors, or receipt of directions from supervisors on more
> than an occasional basis, throughout the workday.

(R. at 14–15). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined

at step four that Plaintiff cannot perform any past relevant work. (*Id.* at 24). At step

five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the

ALJ determined that there are jobs that exist in significant numbers in the national

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual
functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum
that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at
675–76.

economy that Plaintiff can perform, including inspector, marker, and assembler. (*Id.*at 24–25). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 25).

The Appeals Council denied Plaintiff's request for review on January 30, 2015. (R. at 1–5.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue,* 556 F.3d 558, 561–62 (7th Cir. 2009.)

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence

must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has had neck pain dating back to 1994 or earlier. (R. at 542, 545). A January 2007 MRI showed herniated discs in her cervical spine. (*Id.* at 567). After a May 16, 2007 neurological consultation, Neil Allen, M.D., opined that due to degenerative disc disease of her cervical spine, Plaintiff needed to avoid prolonged standing and prolonged sitting, elaborating that "freedom to move from position to position would be necessary in any job that she performed." (*Id.* at 548). In May 2008,

neurologist Scott Metrick, M.D., described tenderness throughout Plaintiff's spine and diminished range of motion in her neck and back. (*Id.* at 448).

From 2008 to 2013, Plaintiff received primary care from Jason Garti, M.D., and care for her neck and back pain from Susan Keeshin, M.D., a rehabilitative specialist. (R. at 421–39; 458–87). In May 2008, Plaintiff complained to Dr. Keeshin of neck pain radiating to her right arm and thumb and low back pain radiating to her right leg. (*Id.* at 458–59). The pain impaired her sleep and made it difficult to do the lifting required for her job at a clothing store. Dr. Keeshin observed that her cervical ranges of motion were limited and opined that Plaintiff needed to change positions frequently to prevent discomfort. She opined that Plaintiff should not carry, push, pull, or lift greater than 10–20 pounds at work, and that she "would benefit from a more sedentary job." (*Id.* at 459). When Plaintiff returned to Dr. Keeshin for a recheck in August 2008, she was not working because of the discomfort in her neck and back. (*Id.* at 483). Plaintiff's lumbar ranges of motion were limited in all directions and the pain from her degenerative disc disease and degenerative joint disease caused a decrease in Plaintiff's ability to perform her activities of daily living. Dr. Keeshin opined that "she certainly is not able to tolerate a physical job, but I do believe she could tolerate sedentary work at this time." (Id at 484).

Plaintiff returned to Dr. Keeshin with neck and back complaints in December 2008, but indicated in February 2009 that Lyrica was helping and she was sleeping better at night. (R. at 460–62). Dr. Keeshin also diagnosed depression and anxiety. (*Id.*). In May 2009, Plaintiff reported an increase in neck pain a few weeks before,

and that a Medrol dose pack prescribed by Dr. Garti had helped her return to her baseline chronic pain level. (*Id.* at 434, 466). By August 2009, Plaintiff's chronic neck and low back pain had been exacerbated by a severe cough over the summer. (*Id.* at 428, 467). In November 2009, Plaintiff reported that her symptoms had worsened since her last visit and that she continued to experience anxiety and depression. (*Id.* at 468–70).

In January 2010, Plaintiff was admitted to the emergency department after a cardiac arrest induced by alcohol, Xanax, and Xyzal (an antihistamine). (R. at 661–62, 668). In an in-hospital consultation with psychiatrist Susanna Kovari, M.D., Plaintiff admitted that she "wanted to go to sleep and not wake up." (*Id.* at 668). She stated that she had been feeling depressed for one to two years and was interested in psychiatric treatment. (*Id.*). Dr. Kovari assessed depression and alcohol abuse. (*Id.* at 670).

Two days later, on January 22, 2010, Plaintiff followed up with Dr. Kovari, describing a two-year history of depression and anxiety "progressively worsening since her divorce 8 months ago." (R. at 653–54). On February 9, 2010, she again saw Dr. Kovari, who noted that she had good adherence to new medications, resulting in a decrease in anxiety and a "somewhat better" mood. (*Id.* at 649).

The course of Plaintiff's physical ailments was "unchanged" in her April 2010 visit to Dr. Keeshin. (R. 471). In September 2010, she reported new complaints of left shoulder pain an impaired ranges of motion. (*Id.* at 474). In April and May 2011, both of her regular doctors observed that she could not lift her arms overhead.

(*Id.* at 422, 480–85). Dr. Garti assessed an injury to Plaintiff's rotator cuff.[3] He also encouraged her to seek psychiatric care for her anxiety and panic attacks. (*Id.* at 422). Plaintiff told Dr. Keeshin that she was frustrated and depressed because of a lack of jobs "that she can physically do." (*Id.* at 480). Dr. Keeshin noted in May that Plaintiff's mood was depressed due to chronic pain issues, that she was unable to tolerate sitting or standing for any length of time, and that her left shoulder issue made it difficult to dress and bathe. (*Id.* at 485).

On May 24, 2011, a Social Security field officer who met with Plaintiff observed that she had her left arm in a sling, repeatedly got up from her chair, talked constantly, had difficulty concentrating, and, at points during the interview "appeared to be in another world." (R. at 322). In a Function Report dated June 9, 2011, Plaintiff indicated that difficulties in lifting, reaching, and bending limit her ability to work, and that an inability to raise her arm over her head affect her abilities to dress, care for her hair, or reach kitchen cabinets. (*Id.* at 338–39, 347). She has trouble opening jars, cans, and packages and cannot lift items like laundry or trash. (*Id.* at 347). She can pay attention "as needed" and follow written or spoken directions "fine." (*Id.* at 343).

On August 11, 2011, Plaintiff told psychological consultative examiner Joan Hakimi, Psy.D., that she needs disability benefits because of her physical impairments and lack of medical insurance. (R. at 489). She stated that chronic pain had caused

---

[3] The rotator cuff is "a musculotendinous structure" providing mobility and strength to the shoulder joint. Dorland's, http://www.dorlands.com//def.jsp?id=100025938 (last visited August 31, 2016.)

her to become very depressed, and that she attempted to commit suicide the year before by taking Xanax and alcohol. (*Id.* at 490). In a physical consultative exam performed the same day, Scott A. Kale, M.D., observed that Plaintiff's left arm was in a sling. (*Id.* at 498). She had no restrictions in her cervical ranges of motion, but her lumbar ranges of motion were limited. (*Id.* at 499, 501). In addition, all of her left shoulder ranges of motion were compromised. (*Id.* at 499). For example, she demonstrated only 80/150 degrees of flexion and 80/150 degrees of abduction, indicating that she could raise her left arm almost parallel to the floor, but not above her head. (*Id.*).

After reviewing portions of Plaintiff's medical records, reviewing psychologist M.W. DiFonso, Psy.D., noted in a Psychiatric Review Technique Form completed on August 25, 2011, that Plaintiff had a mood disorder secondary to her general medical condition, and anxiety. (R. at 504, 507, 509). Dr. DiFonso opined that her psychiatric disorders caused Plaintiff only mild limitations in each of the three functional domains: activities of daily living; social functioning; and concentration, persistence, or pace. (*Id.* at 514).

X-ray images of Plaintiff's left shoulder and lumbar spine ordered by consultative examiner Dr. Kale and performed on September 7, 2011, revealed mild degenerative changes in the AC joint[4] and minimal degenerative change in the lumbar spine. (R. at 519).

---

[4] The acromioclavicular joint (AC joint) is a joint at the top of the shoulder, serving as the junction between part of the scapula and the clavicle.

Ernst Bone, M.D., reviewed portions of Plaintiff's medical records and completed a Physical RFC Assessment Form on October 3, 2011. (R. at 523–30). Dr. Bone opined that Plaintiff was capable of light work, except that she was limited to only occasional overhead use of her left shoulder and limited in pushing and pulling. (*Id.* at 524, 526). She could only occasionally stoop or crouch but had no other postural limitations. (*Id.* at 525). Because a breathing study had revealed a mild obstruction, she should avoid concentrated exposure to pulmonary irritants like fumes, odors, dusts, and gasses. (*Id.* at 527). A Social Security field officer who interviewed Plaintiff on October 27, 2011 observed no specific problems except that Plaintiff appeared "a bit anxious" and "did not move her left arm and indicated that she could not." (*Id.* at 362).

On February 8, 2012, Plaintiff had X-rays of her cervical spine, pelvis, and both hands, and an ultrasound scan of her hands. (R. at 605–08). Rheumatologist Erin Arnold, M.D., reviewed the scan results and examined Plaintiff. (*Id.* at 609–11). Plaintiff stated that she had pain in her arms, back, legs, and fingers. She described the hand pain as a deep throbbing sensation in her finger joints and thumb joints, worse on the right than the left. She also stated she was depressed as a result of the pain. (*Id.* at 609–10). Dr. Arnold observed hand swelling and a deformity with tenderness in Plaintiff's distal finger joints, along with tenderness in her lumbar spine and right hip and some pain with cervical motion. (*Id.*). Dr. Arnold suspected inflammatory arthritis, degenerative arthritis of the cervical spine, and scoliosis of the lumbar spine. (*Id.*). At a follow-up visit with Dr. Arnold on February 29, Plain-

tiff reported that her hand pain was a little bit better but that she was experiencing fatigue and hand stiffness. (*Id.* at 603).

On February 14, 2012, Plaintiff was again found unresponsive and was taken to the emergency department after taking pills with alcohol. (R. at 691, 698). She denied a suicidal intent and was assessed with depression, anxiety, substance abuse, and sleep problems. (*Id.* at 691, 694).

On March 30, 2012, Plaintiff returned to Dr. Keeshin, reporting that her osteo-arthritis had worsened and that she was experiencing 8/10 neck and low back pain, as well as pain in both hands. (R. at 587). Her mood was depressed. (*Id.*). A physical exam again revealed limits in the ranges of motion of her cervical and lumbar spine with some weakness in both upper extremities, along with swelling in the distal finger joints of both hands. (*Id.* at 587, 589). Dr. Keeshin concluded that Plaintiff could not perform a job that involved typing, reaching overhead, or remaining in one position (whether seated or standing) for more than 30 minutes at a time. (*Id.* at 600).

On April 30, 2012, in the first of a series of medication management appointments with psychiatrist Leslie F. Herman, M.D., Plaintiff reported that she was anxious, with multiple panic attacks each day, but denied feeling depressed. (R. at 643). Dr. Herman prescribed Zoloft and Klonopin but Plaintiff declined counseling. (*Id.* at 645). In a follow up one month later, Plaintiff indicated that she felt more relaxed with the medications. (*Id.* at 638).

In June 2012, Dr. Keeshin observed swelling in Plaintiff's finger joints. (R. at 592). At a follow-up appointment two weeks later, Plaintiff reported pain in her neck, joints, and muscles; right-side back pain; and tingling in both hands. (*Id.* at 595). Her cervical and lumbar ranges of motion were limited. (*Id.* at 596). Plaintiff reported depression about her chronic pain issues, along with anxiety and insomnia. (*Id.* at 595).

Plaintiff returned to Dr. Herman on August 15, 2012, reporting that her anxiety had improved, but that she felt sad at times and overwhelmed, with low energy and low motivation. (R. at 633). In January 2013, she reported doing "terrible," with worsening depression and poor concentration due to pain. She stated that she had pain in her back, neck, and fingers, and displayed what the psychiatrist described as "nodules on her fingers from the arthritis." (*Id.* at 627). On March 5, she reported pain and feeling depressed, overwhelmed, and anxious, with poor energy and concentration. (*Id.* at 622).

At her hearing on June 6, 2013, Plaintiff testified that she has pain at a level of 8/10 in her neck and back, radiating into her right leg. (R. at 63–66). She was able to sit or stand at will at her last job. (*Id.* at 47). She estimated that she can walk for about ten minutes and stand or sit for about twenty minutes before needing to move due to pain. (*Id.* at 85–86). She has limited motion in her neck, and it causes her pain to lift her arm to wash her hair. (*Id.* at 67–68). She has depression, and she experiences difficulty concentrating. (*Id.* at 78–79).

Psychological expert Dr. Oberlander also testified, diagnosing an affective disorder associated with chronic pain syndrome, an anxiety disorder, and alcohol dependence. (R. at 109–10). He opined that Plaintiff is "moderately impaired" in the three functional domains, including in "attending, concentrating, remembering, [and] acting with persistence." (*Id.* at 115–16). Nevertheless, she retains the functionality "to engage in work activities of a simple nature" but not to perform complex tasks. (*Id.* at 116–17). She is able to have occasional contact with coworkers, supervisors, and the public; to "remember locations and get herself to a workplace" and to "tolerate moderate levels of change in the work environment." (*Id.* at 117).

Medical expert Dr. Semerdjian also testified, opining that Plaintiff's chronic pain is supported by objective evidence of degenerative disc changes in the cervical spine but that it does not meet or equal a listing. (R. at 138–40, 145). Because there were fewer objective findings with respect to Plaintiff's lumbar spine, other than limitations in ranges of motion, he opined that she can sit for six out of eight hours. (*Id.* at 148). He then allowed that she might still "find it necessary to sit and rest" due to the discomfort in her neck. (*Id.* at 149). He suggested that a limit to two hours of standing or walking would be appropriate based on her history and subjective pain reports, but not on the objective medical evidence. (*Id.* at 153–55, 159). Upon further questioning, Dr. Semerdjian indicated that, if he were to limit his consideration solely to the objective medical evidence in the record, he would have to agree with the RFC that was put forth by Dr. Bone, indicating that Plaintiff is capable of light work. (*Id.* at 156). But, if he were to take into account her subjective symptoms and

the statement of Dr. Keeshin, he would consider her RFC to be sedentary. (*Id.* at 153–54, 157–58).

## V. DISCUSSION

In support of her request for reversal, Plaintiff argues that the ALJ did not properly evaluate the opinion of her treating physician, Dr. Keeshin. She also contends that, in assessing Plaintiff's RFC, the ALJ failed to account for her limitations in concentration, persistence, in pace and inadequately addressed her left shoulder impairment.

### A. The ALJ Did Not Properly Evaluate the Treating Physician's Opinion

Dr. Keeshin, a physical rehabilitation specialist, saw Plaintiff at least twelve times between May 2008 and March 2012. On March 30, 2012, Dr. Keeshin completed an Attending Physician Statement, diagnosing chronic low back pain and neck pain, as well as pain in both hands and numbness radiating into Plaintiff's right leg. (R. at 600–01). Dr. Keeshin indicated that the most recent change to Plaintiff's condition was increased pain and stiffness in her hands due to osteoarthritis. (*Id.*). She opined that Plaintiff could sit, stand, or walk "occasionally," defined as up to 33% of the day, but could not "sit/stand for any extended period of time" or more than thirty consecutive minutes in either position. She could occasionally climb, twist, bend, or stoop, but she could never reach above shoulder level or operate heavy machinery. She could not type due to hand pain, and could only occasionally perform fine finger movements, hand/eye coordinated movements, and pushing/pulling motions. (*Id.* at 600). Dr. Keeshin opined that Plaintiff could lift up

to 20 pounds occasionally, but indicated that Plaintiff should currently be restricted from lifting, pushing, or pulling more than 10 pounds at work. (*Id.* at 600). Dr. Keeshin described Plaintiff's prognosis as "guarded," indicating that she expected no improvement in Plaintiff's abilities. (*Id.*)

In Social Security disability claims, the opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *see Loveless v. Colvin,* 810 F.3d 502, 507 (7th Cir. 2016). Because a treating doctor has "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Gudgel,* 345 F.3d at 470. Where the opinions of treating and nontreating physicians contradict one another, the ALJ must decide which doctor to believe, considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott v. Astrue,* 647 F.3d at 740; *Books v. Chater,* 91 F.3d 972, 979 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

In weighing the opinion of Plaintiff's treating physician and various medical experts, the ALJ wrote, "Dr. Keeshin's opinion is given less weight, as it is not consistent with the medical evidence of record, including the imaging and clinical findings." (R. at 23). The ALJ found that from April 2008 through May 2011, Dr. Keeshin did not note "any significant limitations in [Plaintiff's] physical activity." (*Id.* at 16). This observation is inaccurate. In May 2008, Dr. Keeshin opined that Plaintiff needed to change positions frequently, should not lift greater than ten to twenty pounds at work, and "would benefit from a more sedentary job." (*Id.* at 459). She offered a similar assessment in September 2008: "[Plaintiff] certainly is not able to tolerate a physical job." (*Id.* at 460). Later, in April and May 2011, Dr. Keeshin noted that Plaintiff's left shoulder pain and immobility were affecting her ability to perform basic activities such as dressing and bathing. (*Id.* at 480, 485.)

The ALJ also concluded that Dr. Keeshin's exams were "generally normal" during the same period. (R. at 16). As an example, the ALJ cited five separate notations that Plaintiff had a normal gait. (*Id*). The relevance of Plaintiff's gait to her complaints of neck, shoulder, back, and hand pain is unclear. At the same time, at the exams that the ALJ characterized as "generally normal," Plaintiff consistently showed limited ranges of motion in her lower back and neck. (*Id.* at 459, 461, 463, 465, 467, 469, 472, 476, 478, 482, 484). Later, in April and May 2011, Dr. Keeshin also noted that Plaintiff had pain with motion beyond 90° of flexion in her left shoulder, echoing Dr. Garti's finding that Plaintiff could not raise her left arm overhead. (*Id.* at 422, 482, 486.)

As to Plaintiff's persistent complaints of pain during that period, the ALJ acknowledged Dr. Keeshin's diagnosis of chronic pain (R. at 22), but he ultimately concluded, "Dr. Keeshin appears to have based his [sic] limitations upon [Plaintiff's] complaints as reported, rather than by an analysis of the clinical manifestations of pain on exam. The MRI of her back does not reveal significant abnormalities . . . . [E]xams do not reveal diminished reflexes or sensation [or] significant evidence of muscle weakness or atrophy" (*id.* at 23; *see id.* at 466). When a medical opinion is "based solely on the patient's subjective complaints," an ALJ may discount it. *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012) (citation omitted). At the same time, a patient's subjective statements are one factor in a treating physician's analysis. *See McClinton v. Astrue,* No. 09 C 4814, 2012 WL 401030 at *11 (N.D. Ill. Feb. 6, 2012). Dr. Keeshin's opinions are grounded in both subjective and physical evidence. For example, a 2007 MRI of Plaintiff's cervical spine showed herniated disks, and a 2012 X-ray confirmed loss of cervical disc height and loss of normal cervical lordosis. (R. at 567, 605). X-rays of her hands revealed multiple sites of arthritis. (*Id.* at 606). Plaintiff consistently displayed limitations in the ranges of motion of the affected parts of her spine, and had visible swelling on her hands. In sum, Dr. Keeshin's opinion is not grounded solely in subjective evidence and cannot be rejected on that ground. Because the ALJ's reasons for rejecting Dr. Keeshin's opinions rely on a faulty reading of the medical record, they do not comprise the requisite "good reasons" for withholding controlling weight from the opinion of Plaintiff's treating physician. *Campbell*, 627 F.3d at 306.

Furthermore, even where an ALJ articulates good reasons for withholding controlling weight from a treating physician's opinion, he is still required to determine what weight, if any, to give it. Social Security regulations require the ALJ to evaluate the opinion in light of a series of factors including the nature, length and extent of the doctor-patient relationship; the frequency of examination; the specialty of the doctor; and the consistency and supportability of the opinion. 20 C.F.R. § 404.1527(c)(2); *Scott*, 647 F.3d at 740; *see Roddy v. Astrue,* 705 F.3d 631, 637 (7th Cir. 2013). Here, the ALJ offered an incomplete analysis of the supportability of Dr. Keeshin's opinion and failed to articulate how he analyzed the remaining factors, including Dr. Keeshin's specialty or the extent of her treatment relationship with Plaintiff, in his decision to give that opinion "less weight." This falls short of the "sound explanation" required. *Punzio,* 630 F.3d at 710. This matter must therefore be remanded in order for the ALJ to, first, rectify his errors in summarizing Plaintiff's treatment records, and second, to explain his analysis of the regulatory factors in weighing the opinion evidence.

## B. Residual Functional Capacity

In light of his re-evaluation of the opinion evidence, the ALJ must also reconsider the RFC assessment. When doing so, the ALJ should note that a limitation to "simple, routine tasks" is not sufficient to account for moderate difficulties in maintaining concentration, persistence, or pace. *Yurt v. Colvin,* 758 F.3d 850, 859–60 (7th Cir. 2014). The Commissioner argues that Plaintiff's case falls into the exception to this rule articulated in *Johansen v. Barnhart,* where an ALJ did not err in

adopting the language of an expert who had "translated" Plaintiff's deficiencies into a Residual Functional Capacity assessment. 314 F.3d 283, 289 (7th Cir. 2002). But here, the ALJ went beyond adopting Dr. Oberlander's "translation" and inserted additional language, finding that Plaintiff could perform tasks "at a sustained and workmanlike pace." That wording appears nowhere in Dr. Oberlander's testimony, and the ALJ has not explained how the record supports that conclusion. "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010). Therefore, absent additional evidence about Plaintiff's ability to sustain attention over a period of time, a limitation to "simple, routine" tasks should not be assumed sufficient to account for her moderate limitations in concentration, persistence, or pace.

In addition, after reweighing Dr. Keeshin's opinion, the ALJ should better articulate his reasons for finding that Plaintiff can "occasionally" reach overhead. Plaintiff's left shoulder ailment dates back to at least September 2010. (R. at 474). Medical records from 2011, Dr. Keeshin's opinions from 2012, and Plaintiff's own statements about her personal care suggest that she lacked the ability to lift her left arm overhead at all. (*Id.* at 68, 339, 347, 422, 482, 486, 489, 600). The ALJ should take care to fully address the evidence regarding Plaintiff's left shoulder impairment in his analysis of her RFC.

## VI. CONCLUSION

For the reason's stated above, Plaintiff's Motion for Summary Judgment [Dkt. 18] is granted and Defendant's Motion for Summary Judgment [Dkt. 20] is denied. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 14, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge